**Richmond.**

## Hodges v. S. & R. R. R. Co.

### January 28th, 1892.

1. Streets—*Additional servitude—Compensation.*—Owners of lots abutting on streets own the fee in the land to the middle of the street, subject to the rights of the public to travel over it. Locating a railroad track on the street is an additional burden, which cannot be imposed without compensation to the owner.
2. Injunction—*Corporation—Trespass.*—The remedy for illegal entry by a corporation on lands is by injunction; and plaintiff is not required to show a case of destructive trespass or irreparable damage. The slightest excess of power is sufficient.
3. Condemnation—*Space of sixty feet—Case at bar.*—Whether the statute forbidding the invasion of the owner's dwelling-house or the space of sixty feet about it, was by implication repealed by § 1093 or not, yet, as in this case, the railroad company did not, before invading the street—the fee whereof was in the complainant—and occupying it within sixty feet of his dwelling-house, compensate him therefor, as required by said section;

Held:
>The injunction should be perpetuated.

Appeal from decree of circuit court of city of Portsmouth, rendered September 12th, 1890, in the cause wherein the appellant, Thomas M. Hodges, was complainant, and the Seaboard and Roanoke Railroad Company was defendant. Opinion states the case.

*J. F. Crocker* and *Murdaugh & Marshall*, for appellant.

*Watts & Hatton, John W. Hopper* and *W. W. Gordon*, for appellee.

HINTON, J., delivered the opinion of the court.

On the first hearing of this case, a majority of the court not being able to agree upon the decree to be rendered, a second argument was directed and had. Since that time I have reflected a great deal upon the case, and I now proceed to state very briefly the results of those reflections.

The question to be determined is whether the appellant is entitled to have the injunction awarded him against the Seaboard and Roanoke Railroad Company, on the 31st day of July, 1890, which was dissolved on the 12th day of September, 1890, re-instated and perpetuated.

Now, it is well settled by the common law and the adjudications of our courts, that coterminous owners of lots abutting on streets, in cases like the present, own the fee in the land to the middle of the street, subject to the easement in the public for the purposes of travel. · *Doraston* v. *Payne*, 2 Smith's Lead. Cas. 199; *Bolling* v. *Mayor, &c., Petersburg*, 3 Rand. 503; *Warwick & Barksdale* v. *Mayo*, 15 Gratt. 545; *Petersburg R. R.* v. *Burtons*, 5 Va. L. J. 460; 1 Min. Insts., 120.

And that the occupation of a street by a railroad company is the imposition of an additional burden or servitude upon, and *a taking* of the property of the owner of the fee, within the meaning of the constitutional provision which forbids the taking of private property for public use without compensation, is equally well settled. *Petersburg R. R. Co.* v. *Burtons, supra ; Western Union Tel. Co.* v. *Williams*, 86 Va. R. 696 ; Dill on Mun. Corps. (Ed. 1890), secs. 703, 704; and see *Pumpelly* v. *Green Bay Co.* 13 Wall. 177, where Mr. Justice Miller, speaking for the court upon this subject, says: "It would be a curious and unsatisfactory result if, in construing a provision of·constitutional law, always understood to have been adopted for the protection and security of the rights of the individual as against the government, and which has received the commendation of jurists, statesman, and commentators as placing the just principles of

the common law on that subject beyond the power of ordinary
legislation to change or control them, it should be held that if
the government refrains from absolute conversion of real prop-
erty to the uses of the public it can destroy its value entirely,
can inflict irreparable and permanent injury to any extent, can,
in effect, subject it to total destruction without making any
compensation, because in the narrowest sense of that word it is
not *taken* for the public use.    Such a construction would pervert
the constitutional provision into a restriction upon the rights
of the citizen as those rights stood at common law, instead of
the government, and make it an authority for invasion of
private rights under pretext of the public good, which had no
warrant in the laws or practice of our ancestors." See, also,
Lewis on Eminent Domain, sec. 113, where that learned author
says: " With respect to the abutting owner, highways may be
divided into two classes : First, those in which the public have
an easement; second, those in which the public have the fee.
In respect to the first class, the abutting owner is entitled to
every right and advantage in that part of the street of which
he owns the fee, not required by the public.    He has the entire
right and property in the soil subject to the easement of the
public.    The easement of the public is the right to use and
improve the street for the purposes of a highway only.    A
railroad on the street, being foreign to such purposes, is an
interference with the adjoining owner's property rights in the
soil, and an acquisition or taking of an estate or interest in his
land, for which he is entitled to compensation as in other cases."
And section 115, where the same author says : " It is now well
settled by the great weight of authority that, where the fee of
a street is in the abutting owner, he may recover for the addi-
tional burden caused by a railroad laid on the street.    The
cases which deny compensation in any case, on the ground
that a railroad is a legitimate use of a highway, are so clearly
against good sense and reason, that we do not think they
require further discussion."    Cooley, Const. Lim. (6th Ed.),
1190.

And that injunction is the proper remedy in all cases where there has been an unlawful imposition of a railroad upon private property is clear beyond controversy. High on Injs., § 392 *et seq.;* Lewis on Eminent Dom., § 631; *Story* v. *N. Y. Elevated R. R. Co.,* 90 N. Y. 161; *Williams* v. *N. Y. C. R. R.,* 16 N. Y. 179; 2 Story Eq. Jur., § 925; *Shepherd* v. *Manhattan R. R. Co.,* 117 N. Y. R. 449. And see *Manchester Cotton Mills* v. *Manchester,* 25 Gratt. 828, where Staples, J., makes the following pointed observations : " It is said by an eminent author that a private person who applies for an injunction to restrain a public incorporated company or body of functionaries from entering illegally on his land, is not required to make out a case of destructive trespass or irreparable damage. The tendency of such bodies to act oftentimes in an arbitrary manner and the inability of private persons to contend with them, it is said, raises an equity for the proper interference of the court whenever there is the slightest excess of power. The general spirit of the latter cases is, therefore, to favor relaxation rather than the strict application of the rule which denies the right to resort to equity when there is a remedy at law. And again, on page 830, he says : " It is no answer to him to say that for the appropriation of his lot he may recover in ejectment, and for the destruction of his valuable buildings he may recover in damages. Universal experience demonstrates how ineffectual such a remedy is to afford a just compensation, especially in controversies with a corporation backed by all the appliances of wealth and the influence of public sentiment."

Now in this case, the effect of the company's action is to take the plaintiff's property without his consent. Can this be done ?

There has been on the statute books of this commonwealth for more than forty years the following provision, now made a part of section 1072 of our Code, the history of which provision it is of importance, in this connection, for us to trace. This provision first made its appearance in the second Revised Code, 1819, § 7, page 213, by which *turnpike companies* were

authorized to enter upon all lands and tenements through which they might judge necessary to make their roads, to lay out the same according to their pleasure, so that neither the dwelling-house, yard, garden, or curtilage of any person be invaded without his consent. A like provision was made in the act of March 16th, 1832, incorporating the stockholders of the James River & Kanawha. Company. Acts 1831–'2, § 29, p. 79.

In the first general railroad act of the state, March 11, 1837 (Acts 1836–'7, § 9, p. 104), it was provided: "Previously to the institution, and during the pendency of the proceeding for ascertaining the damages to the proprietor for the condemnation of his land for the use of the company, the president and directors, their officers, agents and servants, shall have full power and authority to enter upon all lands and tenements through which they may desire to conduct their railroad and to lay out the same according to their pleasure, so that no dwelling-house, or space within sixty feet of one, belonging to any person be invaded without his consent, and if they think the interest of the company requires it to take possession thereof for the purposes of the company."

In 1841 this provision came under review in *James River and Kanawha Co. v. Anderson, &c.,* 12 Leigh, 278, where the court held that, upon the construction of its aforesaid charter, the company had the right to enter upon and occupy the public streets of a town, as well and in like manner as the lands of individuals, when it shall deem the same necessary for its canal or other works, liable to make compensation in damages to any party injured. Judge Tucker, on page 314, saying: "For the purposes of its work it is authorized to enter upon any lands and tenements through which it desires to conduct its canal without any limitation or exemption, except the dwelling-house, yard, garden or curtilage of any proprietor. The. streets and highways, which must obviously be encroached on, are not excepted. The streets of Richmond, therefore, are as much

subject to be entered upon for the use of the company as any other property."

In this case the court held that, under the language of the James River and Kanawha Company, authorizing it "to enter upon all lands and tenements, &c.," it could enter upon the streets of a city as upon any other land.

To obviate this objection, which equally applied to the general railroad law, the legislature enacted the following provision, to be found in section 23 of chapter 56 of the Code of 1849:

"No company shall occupy with its works the streets of any town until the corporate authority of the town shall have assented to such occupation, unless such assent be dispensed with by the special provision of law." See Report of Revisors, pp. 328 and 329.

As the law then stood, the railroad company could only enter the streets of a city or town upon the consent of the corporate authority, but could not "invade the dwelling-house of any, or any space within sixty feet thereof." That is, while such companies might, under certain circumstances, enter cities, they were prohibited from invading the dwelling-house of the citizen, or any space within sixty feet thereof belonging to the citizen, without his consent. See *R. & Y. R. R. Co.* v. *Wicker*, 13 Gratt. 375, where the court uses the following language: "In my opinion the terms of the statute, standing alone, import that a dwelling-house, and a space of sixty feet about it, are exempt from invasion by internal improvement companies, as being reserved to the owner thereof. Without such invasion the owner enjoys his dwelling-house and circumjacent land to the extent of his boundary, however large. If, however, public necessity requires that a portion of his property be taken from him, it may be done, but not so as to invade his dwelling-house, or a space of sixty feet about it. The law merely reserves to the owner a limited extent of his own property, but does not confer on him any control whatever over the land of the coterminous owner."

In this state of the law the legislature enacted the following provision:

" 1. Be it enacted by the general assembly of Virginia, that section 24 of chapter 56 of the Code of 1873 be amended and re-enacted so as to read as follows:

" Section 24. No company shall cross or occupy with its works the streets or alleys, public or private, of any city or town without the assent of the corporate authorities thereof, unless such assent be dispensed with by special provision of law; and in case any lot or lots along the line of such streets or alleys shall, by such occupation or crossing, be impaired in value, such company shall, before crossing or occupying such streets or alleys, make compensation therefor to the owner of the same; said compensation to be ascertained in the manner provided by law for the assessment of land damages.

" 2. This act shall be in force from its passage." Act approved January 15th, 1875; Acts, 1874–'75, pp. 35, 36.

And it is claimed that this provision by implication repeals so much of the act as prohibits these companies from constructing their works, &c., within sixty feet of the land of the citizen as may lie circumjacent to his dwelling-house. And while the law does not favor repeals by implication, this seems to be so, else there could not have been any use for so much of the act as provides that, " in case any lot or lots along the line of such streets or alleys shall, by such occupation or crossing, be impaired in value, such company shall, *before* crossing or occupying such streets or alleys, make compensation therefor to the owner of the same."

This, however, cannot advantage the defendant company in this case, for, as it it has not chosen to pursue the only way pointed out by the statute for invading the street, the fee in which, as we have seen, was in the appellant, and is within sixty feet of his dwelling-house, it has not acquired the right to use this street.

The injunction, therefore, must be perpetuated.

LACY, J. (concurring), said:

The bill was filed in this case by the appellant against the appellee company, the Seaboard and Roanoke Railroad Company, to restrain it from laying or using any railroad track on that part of Crawford street, in the city of Portsmouth, which is in front of his lot of land and between his residence, situated on said lot and the middle of the street. Upon this bill the honorable judge of the circuit court, for the said city, endorsed his refusal, as follows: "I have examined this case with all the care I could give it, and appreciating its great importance have reflected long and seriously upon it, without being able to satisfy myself that it is a proper case for an injunction. Having thus reflected, and being very doubtful whether it is or not (inclining to the opinion that it is not), I must refuse the injunction prayed for." July 28th, 1890.

Whereupon, application was made to one of the judges of this court, by whom, on the 31st of July, the injunction was awarded in accordance with the prayer of the plaintiff's bill. The defendant company answered, denying the plaintiff's right to any part of the street in question, and alleging the permission of the common council of the said city, and a great necessity for the proposed extension of its line on Crawford street. Depositions of witnesses were taken, and on the 12th day of September, 1890, the cause coming on to be heard in the said circuit court of Portsmouth, the decree appealed from was rendered, dissolving the injunction awarded herein on the 31st day of July, 1890; and the appellant appealed to this court.

The appellant is the owner of the lot in question, situated on Crawford street, and claims that his ownership extends to the centre of the street, subject only to the easement of the public in the street for the purposes of ordinary travel.

The appellee company contends that the fee of the street is in the city of Portsmouth and not in the appellant, and that the appellant is the owner to the street and no farther. That

the city of Portsmouth is a statutory town; was laid off by its founder, William Crawford, in 1752, who laid out a parcel of land on the south side of Elizabeth river, opposite to the town of Norfolk, one hundred and twenty-two lots, commodious streets, places for a court-house, market, and public landings, for a town by the name of Portsmouth, and made sale of most of the lots, and that the colonial legislature in that year enacted an act declaring that the said piece or parcel of land be, and is, hereby constituted, appointed, erected, and established a town in the manner as already laid out by said William Crawford in lots and streets, to be called by and retain the name of Portsmouth; and at the same time filed with the clerk, in the clerk's office, a plat and survey on which the said lot and street were shown, and that the dedication of the said street being a statutory dedication, that there is no foundation for the plaintiff's claim that he owns to the centre of the street by reason of these transactions.   The street being thus dedicated by the owner of the land to the public for a highway, and the same accepted by the public as such, what rights did the public acquire in the said highway as against the owner of the adjoining land? and what remained in the said owner of the adjacent land and passed by his deed to the same to his vendee?

It is a general principle of the common law, well established in England, and illustrated and enforced by the American decisions, that the property of the highway is in the owner of the soil, subject to an easement for the benefit of the public.   It is said, in repeated decisions, that the highway is a passage that is open to all the king's subjects.

The interest of the public in a highway consisting solely in the right of passage, the soil and freehold over which that right of way is exercised, may be and generally is vested in a private owner, who may maintain an action against persons who infringe his rights therein, as, for instance, by permitting cattle to depredate there, or by hunting thereon.   And it was held that the general *prima facie* presumption of law is that

the freehold of the road *usque ad medium filum viæ*, is in the proprietors of land on either side. " This presumption," said Cockburn, C. J., in the case of *Holmes* v. *Billingham*, 7 C. B. N. S. 329, " is allowed to prevail upon grounds of public convenience, and to prevent disputes as to the precise boundaries of property, and is based upon this supposition, which may be more or less founded in fact, but which has at all events been adopted, that when the road was originally formed, the proprietors on either side each contributed a portion of his land for the purpose." And the right of passage over a highway by the public is defined as an easement, which is a liberty, privilege or advantage in land without profit, existing distinct from an ownership of the soil. A highway may be created by legislative authority exercised either directly or through a municipal corporation, authorized by its charter to open streets, or through general road laws which exist in most states, empowering justices or county courts to act upon the petition of the inhabitants, or it may arise from a dedication by the owner; and a dedication is defined to be the act of devoting or giving property for some proper object and in such manner as to conclude the owner. Thus, if one owning land exhibit a map of it on which a street is defined, though not as yet opened, and building lots be sold by him with reference to a front or rear on that street, or lots be conveyed being described as by streets, this is an immediate dedication of that street, and the purchasers of lots have a right to have that street thrown open, and this right is not limited to the single street on which such lots may be situated.

If the owner of land lays out and establishes a town, and makes and exhibits a plan of the town with various plots of spare ground, such as streets, alleys, quays, &c., and sells the lots with clear reference to that plan, the purchasers of lots acquire as appurtenant to their lots every easement, privilege, and advantage which the plan represents as belonging to them as a part of the town, or to their owners as citizens of the town ;

and the right thus passing to them is not the mere right that such purchasers may use these streets or other public places according to their appropriate purposes, but a right vesting in the purchasers, that all persons whatever, as their occasion may require or invite, may so use them, and that they shall be forever open to the use of the public, free from all claim or interference of the proprietor inconsistent with such use.

The highway is, generally speaking, nothing but an easement comprehending merely the right of all the individuals in a community to pass and repass with the incidental right of the public to repair. This easement does not comprehend any interest in the soil, nor give the public the legal possession of it. The right of freehold is not touched by establishing a highway, but continues in the original owner of the land in the same manner it was before the highway was established, subject to the easement. The public has the right to pass and repass, and to repair, and anything which obstructs the use of the way, is a public nuisance. Subject to this easement, the exclusive ownership of the soil, the freehold and all the profits remain in him who owned the ground before the highway was laid out over it; and he may maintain trespass or waste or recover possession subject to the easement. The herbage belongs exclusively to the owner of the soil, and he may maintain trespass against one who puts his cattle in the highway to graze, or against one who places obstructions there, or who, instead of passing along it, remains standing there, as a strolling musician, refusing to depart. The fact that the street, dedicated to public use, is within an incorporated city, makes no difference as to the ownership of the soil. The title remains in the owner; and except where there has been a regular conveyance or legislative transfer, is never in the corporation.

These principles are well settled in most of the states of this Union, and in none more firmly than in Virginia. See the case of *Derustin* v. *Payne*, 2 Smith's Lead. Cas., p. 142, and the

authorities there cited, among them the case of *Bolling* v. *City of Petersburg*, 3 Rand. 563. In that case it was held that a public highway only vests in the commonwealth a right of passage; but the freehold and the profits (such as trees upon it and mines under it) belong to the owner of the soil, who has the right to all remedies for the freehold, subject, however, to the easement.

In *Warwick & Barksdale* v. *Mayo, Mayor*, 15 Gratt. 545, it is said: The easement comprehends no interest in the soil. The right of freehold is not touched by establishing a highway, but continues in the original owner of the land in the same manner it was before the highway was established, subject to the easement. The dedication or laying out of a street within a corporation does not affect the ownership of the soil, and however enlarged the easement may be when within the limits of a corporation, in order to the beneficial use of it, and to effect the purposes intended when the easement was created, subject to such use, whether enlarged or limited, the title remains in the owner. In the case of *Petersburg R. R. Co.* v. *Benton*, reported in 5th Va. L. J., 460, which is one of the best-considered cases I have seen on this subject, it is held by the special Court of Appeals of Virginia, opinion by Judge McLaughlin, " that from a careful review of all the authorities upon this question, that the preponderance is strongly in favor of the doctrine that when a railroad company invades the streets of a city or town, even with the permission of the authorities of the city or town, and the fee simple to the street remains in the adjoining lot, owners and the proprietors of said lots sustain special damage for such invasion, as in this case, they are entitled to recover therefor, and that this doctrine is sustained by reason as well as authority. It can hardly be supposed that when a lot-holder dedicated a part of his lot to a public street to be used as a public highway, he contemplated that it would be occupied and used by a railroad company for its track, thus interfering with the loading and unloading of vehicles; imped-

ing free access across the street, and endangering the building by passing engines and imperiling the lives of those who sought to use the street for the purposes originally contemplated," citing *Williams* v. *N. Y. C. R. R. Co.*, 16 N. Y. 97, where it was held that the dedication of land to the use of the public as a highway, does not preclude the owner of the fee, subject to the public easement from maintaining an action against a railroad company, which, without his consent or an appraisal of his damages, enters upon and occupies such highway with the track of its road, and holding that such an appropriation of the highway by the railroad company is the imposition of an additional burden upon and taking of the property of the owner of the fee within the meaning of the constitutional provision which forbids such taking without additional compensation, and that the company can derive, therefore, no title under the acts of the legislature, and the license or consent to a use inconsistent with the public easement of municipal or other authorities who represent the public as to such right, without the consent of the owner of the fee or the appraisal and payment of his damages in the mode prescribed by law. *People* v. *Law*, 34 Barb. 502; *Yates* v. *Ohio & M. R. R. Co.*, 7 Porter (Ind.) 497; *Haynes* v. *Thomas*, *Id.* 38; *Knox* v. *The Mayor*, 55 Barb. 405; *Heath* v. *Burnam*, 48 Barb. 498; *Troy Union Railroad* v. *Wager*, 25 N. Y. 532.

In *Mott* v. *Mott*, 68 N. Y. R. 247, it is said: "Where lands are granted bounded upon a highway or stream not navigable, unless by the terms of the grant or by necessary implication, the highway or bed of a stream are excluded, a title will pass to the centre of the highway or stream. The reason is obvious. Ordinarily, in a conveyance of that kind, there is no purpose to be served in the retention by the grantor of a narrow strip of land along the boundaries of the land conveyed, and between it and the lands of other properties, or in the bed of a stream; and the intent to grant to them will be presumed, therefore, by a conveyance of the adjacent lands bounded by

or upon or along such highway or stream, or other equivalent phrase. It depends upon the intent of the parties to be gathered from the description of the premises, read in connection with other parts of the deed, and by reference to the situation of the lands and the condition and relation of the parties to those and other lands in the vicinity, whether the grant extends to the centre of the road or stream. This is the recognized rule of interpretation, and it is a question of interpretation and intent. *Seneca Indians* v. *Knight*, 23 N. Y. 498; *Bissell* v. *N. Y. C. R. R. Co., Id.* 61. In the last-named case, which was a case where lots were designated and conveyed by numbers, according to plan showing streets and lots, it was held, as between grantor and grantee, the conveyance of a lot bounded upon a street in a city carries the land to the centre of the street. There is no distinction in this respect between streets in a city and county highways;" saying further: "If the rule of construction in regard to such grants is not to be considered as settled in this state, I am inclined to hold that the inference of law is that such a conveyance carries with it the fee to the centre of the street as a part or parcel of the grant. There is no more reason, it seems to me, to infer an intention in the grantor to withhold his interest in or title to the land covered by the street, after parting with all his right and title to the adjoining land, than there is in a case of a deed bounded by a public highway. I have not been able to discover any reason which can be given in one case which is not equally applicable to the other."

In *Perrin* v. *New York Central Railroad Company*, 36 N. Y. 120, it was held, where town lots are sold and described only by numbers on the recorded map, by which they appear to be bounded by the centre of the street or highway, such lots are to be bounded by the centre of the street.

Mr. Minor says that the public acquires merely a right of passage. The freehold, and all profits of the soil, belong still to the proprietor from whom the right of passage was acquired.

He may, therefore, recover the freehold in ejectment, subject to the right of way, and may maintain an action of trespass for digging the ground. If it be unknown from which of two adjacent proprietors a highway was at first taken, or if the highway be the boundary between them, they are understood to own each *ad medium filum viæ*. Bac. Abr. (B.), *Home* v. *Richards*, 4 Call, 441; *Harris* v. *Elliott*, 10 Pet. 25.

At common law, as we have said, a highway is simply an easement or servitude, carrying with it, as its incidents, the right to use the soil for the purposes of repair and improvement, and in cities for the more general purposes of sewerage, the distribution of light and water, and the furtherance of public morality, health, trade and convenience. The owner of the land over which the highway passes retains the fee and all rights of property not incompatible with the public enjoyment, and whenever the highway is abandoned or lost, recovers his original unincumbered dominion. He may sell the land, subject to the easement; and a deed of land reserving only the highway through the said farm conveys the land subject only to the easement. Rolle Abr. 392; Comyn's Dig., tit. Chimin, (A. 2); *Lade* v. *Shephard*, 2 Str. 1004; *Goodtitle* v. *Alker*, 1 Burr. 133; *Grose* v. *West*, 7 Taunt. 39; *Coke* v. *Green*, 11 Price 736; *Doe of Pring* v. *Pearsey*, 7 B. & C. 304; Cro. Jac, 190; 4 Bacon's Abr. 668; *Meynell* v. *Surtees*, 31 Eng. Law and Eq. 485.

"The owner of the soil," said Foster, J., in *Goodtitle* v. *Alker*, *supra*, "has a right to all above and under ground, except only the right of passage for the king and his people;" and Mansfield, J., in the same case, quoting from Rolle's Abridgment, remarked, "that the king has nothing but the passage for himself and his people; but the freehold and all the profits belong to the owner of the soil; so do all the trees upon it, and mines under it, which may be extremely valuable. The owner may carry water in pipes under it. There is no reason why he should not have a right to all remedies for the

freehold, subject still, indeed, to the servitude or easement. An assize would lie if he should be disseized of it; an action of trespass would lie for an injury done to it. It is equally true, as has been illustrated by many cited cases going before, that the principles of the common law in this respect have been recognized and adopted by the American courts, and may be found distinctly stated by the text-writers. Chancellor Kent says (3 Kent. Comm., p. 433): " The established inference of law is that a conveyance of land bounded on a public highway carries with it the fee to the centre of the road as part and parcel of the grant. The idea of an intention in a grantor to withhold his interest in a road to the middle of it, after parting with all his right and title to the adjoining land is never to be presumed. It would be contrary to universal practice ; and it was said in *Peck* v. *Smith*, 1 Conn. 127, that there was no instance where the fee of a highway, as distinct from the adjoining land, was ever retained by the vendor. It would require an express declaration, or something equivalent thereto to sustain such an inference, and it may be considered as a general rule that a grant of land bounded upon a highway or river, carries the fee in a highway or river to the centre of it; provided the grantor at the time owned to the centre, and there be no words or specific description to show a contrary intent. The soil under the highway if it passes at all, passes as *parcel* of the land, and not as appurtenant." The language of Parsons, C. J., in *Perley* v. *Chandler*, 6 Mass. 454, is an exact statement of these principles.

" By the location of a way over the land of any person, the public have acquired an easement, which the owner of the land cannot lawfully extinguish or unreasonably interrupt; but the soil and freehold remain in the owner, although encumbered with a way, and every use to which the land may be applied; and all the profits which may be derived from it consistently with the continuance of the easement the owner can lawfully claim. He may maintain ejectment for the land thus

encumbered; and if the way be discontinued, he shall hold the land free from the encumbrance."

We have considered some of the Virginia cases, to which may be added the recent case of the *Western Union Telegraph Company* v. *Williams*, 86 Va. 696, and the authorities there cited, in which case it is said : " It is obvious, and is so held in many cases, that the construction of a railroad upon a highway is an additional servitude upon the land for which the owner is entitled to additional compensation," citing Cooley Const., Lim. 548; *Ford* v. *Railroad Co.*, 14 Wis. 616; *Pomeroy* v. *Railroad Co.*, 16 Wis. 640; *Imlay* v. *Railway Co.*, 26 Conn. 255; *Nicholson* v. *Railroad Co.*, 22 Conn. 85; *Railroad Co.* v. *Steiner*, 44 Ga. 546, and numerous other cases.

Lewis on Eminent Domain, § 113.

Dillons M. Corp., §§ 703, 704, 704a and notes. Angell on Highways, 366, 388, where it is said : " It may be stated as the fair conclusion from the authorities, that a grant of land, described as bounded generally, 'by' or 'on' or 'along' a highway, carries the fee to the centre of the highway, if the grantor owned so far."

It is therefore clear that the soil of the street in question dedicated in the manner already stated, is the property of the appellant. It is equally well settled by the authorities, we have already cited that this private property cannot be taken for public uses except upon just compensation. *Western Union Telegraph Company* v. *Williams*, *supra*; Art. 5, § 14 Const. of Va.

To establish a railroad upon the land is to impose an additional servitude thereon, and is a taking within the meaning of the constitution.

To take the whole subject, the land in fee, is a taking. This, however, is the meaning of the term only in a limited and in the narrowest sense of the term.

The constitutional provision which declares that property shall not be taken for public use without just compensation, was intended to establish this principle beyond legislative con-

trol, and it is not necessary that property shall be absolutely taken, in the sense of completely taking to bring the case within the protection of the constitutional provision referred to. See opinion of Justice Miller, in *Pampelly* v. *Green Bay Co*, 13 Wall. 166. The property in this case taken, was taken without any compensation whatever, as in the case of *Western Union Telegraph Company* v. *Williams, supra*. And the taking is sought to be justified, as in that case, by an act of the legislature. Private property can only be taken against the consent of the owner, by the exercise of the power of eminent domain, and then upon making just compensation. The entry upon the street in this case by the railroad is sought to be justified by the section 1093 of the Code of Virginia, which is relied on to give the right. That section provides that " no company shall cross or occupy with its works the streets or alleys, public or private of any city or town, without the assent of the corporate authorities thereof, unless such assent be dispensed with by special provision of law; and in case any lot or lots along the line of such streets or alleys, shall by such occupation or crossing, be impaired in value, such company *shall before crossing* or occupying such streets or alleys, make compensation therefor to the owner of the same, said compensation, if the parties cannot agree upon the same, to be ascertained in the mode prescribed by law."

The assent of the town authorities was obtained in this case, but no compensation was paid or tendered to the plaintiff, who claims that his property was not only impaired in value to some degree, but well nigh destroyed by the proposed taking. That his lot is his place of residence in the residential part of the city; that his dwelling-house is situated thereon, which is the home of himself and his family, and that it is only valuable as a place of residence, and is not at all adapted to commercial purposes; and it is claimed in his bill that the appellee company is about to lay a double track of rails on this street for a great distance, running in front of his house, which is situated

within sixty feet of the centre of the street, over which the said company, which controls a great system of railroads, and carries for profit enormous quantities of freight along this street over these tracks; that the consequence will, and necessarily must, be that day and night its engines, cars and trains will be kept constantly moving backward and forward on the double track which it is constructing; that the constant jar and noise of its moving engines and trains, the puffing and whistling of its engines, the ringing of bells, the emission of smoke and the clamor and confusion incident to the use of said tracks by said company will destroy his dwelling-house as a place of residence, and thus do him irreparable injury; and the facts appearing justify this apprehension.

He cites for his protection against this invasion of his home section 1072 of the Code of Virginia, which provides, among other things, as follows: "Nor shall a company, under any provision of this chapter (chapter 44, as to corporations generally), invade the dwelling-house of any person, or any space within sixty feet thereof, without the consent of the owner thereof." It is admitted that no compensation has been made to the appellant for the impairment of the value of his property, incident to this proceeding; that his house is within sixty feet of the tracks so laid down near him, for they have been laid down between the 28th of July, when the circuit court refused the injunction asked for by the plaintiff, and the 31st of the same month, when it was granted by one of the judges of this court; and that this was done without his consent and against his protest, as the record shows; that when the injunction was refused on the 28th of July, he gave notice in writing to the appellee company that he would apply to one of the judges of this court for the injunction which the circuit court had refused, as is provided by law in such case.

But it is insisted that under the leave granted by section 1093 of the Code of Virginia, *supra*, the appellee company was authorized to come upon the said street, and therefore neces-

sarily within sixty feet, as the street is not wide enough to go there without infringing the provision as to the sixty feet; and that the compensation can be now paid, when properly assessed; that the two sections in such case cannot stand together, and the provision as to the sixty feet cannot therefore apply. But this is very illogical. It might, with equal force at least, be argued that the section 1093 did not apply, as it could not consist with section 1072. But the section 1093 provides for this, and, by its terms, dominates all other sections of chapter 44 of the Code. The law is, as enacted in section 1072: "Nor shall a company, under *any provision of this chapter*, invade the dwelling-house of any person, or any space within sixty feet thereof." The learned counsel for the appellant argues that every section of chapter 44 must be read with this proviso added: "Nor shall a company, under *any provision* of this chapter invade." What does this mean, if it does not mean this, I do not perceive. And I think this argument is correct. Whatever is granted in any section of this chapter is granted with this limitation upon its provisions, to-wit: "but under this section a company shall not invade the dwelling-house of any person, or a space within sixty feet thereof." I do not see how it can mean anything else. This is not an unreasonable construction of this chapter, but gives force and effect to every provision in it as it is written..

We have little to do with the wisdom of the law in throwing this line around every domicile in the land; that is a question for the legislature.

But when the power of the sovereign state is placed in the the hands of corporations to go and take the private property of others everywhere without their consent, it appears to me a just and salutary check upon the large powers granted, and a modest reservation made by the governing power of the place called "the home." It is also admitted that this appellee company has already a track through this city to its wharves, unquestioned; and it is evident that if they need a shifting

yard, it can be condemned outside of this city without an infraction of section 1072, *supra.*

The only remaining question to be considered is whether an injunction was the proper mode to proceed to prevent the irreparable mischief threatened; and about that I think there is no doubt whatever, unless the plaintiff could be expected to wait upon the slow processes of the courts of law while his property was being destroyed; for to the healthy resident, under the stated circumstances, the situation would be simply intolerable, and the most robust health would fail under such surroundings. And what should be said of the sick man? A residence in such a locality, thus surrounded, would well-nigh be impracticable.

The plaintiff was clearly entitled to an injunction. See High on Injunctions, sections 392, 408; Lewis on Eminent Domain, sections 631, 632, and authorities cited; *Manchester Cotton Mills* v. *Manchester*, opinion of Staples, J., and authorities there cited; *Norfolk & Western R. R. Co.* v. *Smoot*, 81 Va., and section 1081 of the Code of Virginia are not in conflict. This case is not like that case. There the railroad authorities were not exceeding their authority; here they plainly are.

For the foregoing reasons we are of opinion to reverse the decree complained of and appealed from here, and to render here such decree as the said circuit court ought to have rendered, and to perpetuate the injunction awarded in this case on the 31st day of July, 1890.

LEWIS, P. and RICHARDSON, J , *dissented.*

DECREE REVERSED.