## Richmond.

### HOME BUILDING AND CONVEYANCE COMPANY v. CITY OF ROANOKE AND ANOTHER.

#### JANUARY 31, 1895.

1. CITY CHARTER—*Powers—Bridge—Approaches.*—The grant to a city by its charter of power "to close or extend, widen or narrow, lay out, graduate, curb and pave, and otherwise improve the streets, sidewalks, and public alleys in said city," and also to "build bridges in and culverts over said streets" is a sufficient grant of authority to build an approach to an elevated bridge in its streets. The approach is but the grading of the street to adapt it to the use and need of the public.

2. CITY—*Public Agent—Liability for Damages.*—A city, acting within its charter powers in improving its streets, is the agent of the State, and is not answerable for consequential damages, where the work is done with care and skill, and does not actually encroach upon private property.

3. STREETS—*Grading—Servitude—"Taking"—Article V. Const. Section 14.*—The building of an approach to an elevated bridge in the streets of a city, leaving a space of about seven and one-half feet on each side, for the convenience of the public or adjacent owners, when there is no actual encroachment on the property of the abutting land owner, does not create any additional servitude on the land, and is not a "taking" of private property, within the meaning of Article V., section 14, of the Constitution of Virginia, though the use of the property may be thus impaired. The resulting damage, if any, is *damnum absque injuria.* And it is immaterial whether the fee in the street is in the city, the State, or the abutting land owner.

4. CITY CHARTER—*Public Improvements—Letting Contracts.*—The provision of a charter which requires all contracts for the erection of public improvements or buildings to be let to the lowest responsible bidder, does not inhibit the city from constructing public buildings or improvements under the direction of its own engineers or officers, but applies only to such buildings or improvements as are let to contract.

Appeal from a decree of the Circuit Court of the city of Roanoke, pronounced November 9, 1891, in a suit in chancery, wherein the appellant was the complainant, and the city of Roanoke and another were the defendants.

*Affirmed.*

The opinion states the case.

*Scott & Staples*, for the appellant.

1. The structure is an additional servitude on the lands of the appellant. *Western Union Telegraph Company* v. *Williams*, 86 Va. 696. The appellant has a peculiar interest in the adjacant street, viz: easements of access, light and air, which are property or property rights, and as such are as inviolable as the property in the lots themselves. 2 Dill. Mun. Corpn. sec. 712; Elliott on Streets, 526; *Blanahan* v. *Hotel Company*, 39 Ohio State, 334 S. C. 48 Am. Rep. 457; *Story* v. *New York El. R. Co.*, 90 N. Y. 146; *Norfolk City* v. *Chamberlain*, 29 Gratt. 534.

2. Injunction is the proper remedy to test the complainant's rights.

In addition to authorities already cited, see *Manchester Cotton Mills* v. *Town of Manchester*, 25 Gratt. 825; *Oakley* v. *Williamsburg Trustees*, 6 Paige, 262; *Clark* v. *Mayor of Syracuse*, 13 Barb. 33; Kerr on Injunctions, 199, 295, 304; High on Injunctions, sec. 350; Story's Eq. Jur. 258, note; 2 Dillon Mun. Corpn. sec. 644, 723; *Hodges* v. *Seaboard R. R. Co.*, 88 Va. 653.

3. The charter of the city itself provides that, in the exercise of the power of constructing bridges, no property shall be taken without compensation. Sec. 23 of charter of city of Roanoke.

*W. A. Glasgow, Jr.*, and *Thomas W. Miller*, for appellee.

1. The city has the power to build bridges in its streets by

express provision of its charter, and the power to build the bridges carries with it the incidental power to build the approaches.    Acts of Assembly, 1883-4, p. 91, sec. 18; *Freeholders of Sussex* v. *Strader* (N. J.) 35 Am. Dec. 530; *Commonwealth* v. *Deerfield*, 6 Allen (Mass.), 449, 459.

2. The city acquired this street by dedication, and at the time the injunction was granted was using the street, building a bridge therein, and otherwise improving it.    The granting of this injunction was not only prohibited by the city charter, but also by sec. 1081 of the Code.    See in this connection 10 Am. and Eng. Ency. Law, 790 and notes; *Georgia Pacific R. Co.* v. *Douglasville*, 75 Ga. 825.    If the complainant is entitled to any relief it is at law and not in equity.    *Osborne* v. *Missouri Pacific Ry.*, 147 U. S. 248.

3. The duty is devolved upon the city, by its charter, to improve its streets, and if this is done in a careful and reasonable way and injury results to a citizen, it is *damnum absque injuria*.    *Smith* v. *Corporation of Washington*, 20 How. 325; *Smith* v. *City Council of Alexandria*, 33 Gratt. 208, 211.

CARDWELL, J., delivered the opinion of the court.

The city of Roanoke, on the 29th day of July, 1890, entered into an agreement in writing, duly executed, with the Norfolk and Western Railroad Company, whereby the said railroad company agreed on its part to build and furnish the material therefor, at its own expense, an overhead bridge across the railroad at three points in the city of Roanoke, among the number at Randolph street, where it intersected with Railroad avenue running parallel to said railroad, and in consideration whereof the city of Roanoke agreed on its part to build the approaches to said bridges.    Accordingly, the city of Roanoke proceeded to construct the approach to the bridge to be

erected, and which has been erected by the Norfolk and Western Railroad Company across its roadbed at the point named, in Randolph street, and the city prosecuted the work till enjoined, as will be hereinafter stated.

On August 4, 1891, the Home Building and Conveyance Company, a corporation duly chartered under the laws of Virginia, as owner of a certain lot of land in the city of Roanoke, situated on the east side of Randolph street, at and near the intersection of said street with Railroad avenue, and as a taxpayer of said city, presented its bill of complaint, together with certain exhibits and affidavits therewith, to the Hon. Henry E. Blair, judge of the Circuit Court of the city of Roanoke, praying that the city, and one, T. S. Boswell, their agents, &c., be enjoined and restrained from further prosecuting the work, and that all obstructions placed by them in and upon Randolph street be removed, unless complainant was compensated for injuries sustained, &c. And the defendants to the bill, having been notified of the application for the injunction, appeared by counsel and filed their demurrers and answers to the bill, to which answers the complainant replied generally; but the judge, for reasons stated in the order entered by him August 6, 1891, refused to grant the same; whereupon, the complainant, after first agreeing with defendants as to the time and place thereof, on the 20th day of August, 1891, at Marion, Va., renewed its motion for injunction before one of the judges of this court, who likewise refused it. After notice to the defendants, complainant, on the 14th day of September, 1891, presented before another of the judges of this court, at Staunton, the original papers theretofore presented to the judge of the Circuit Court of the city of Roanoke, and again renewed its motion for an injunction according to the prayer of the bill, which was granted; and the cause, together with all papers therewith, were remanded to the Circuit Court of the city of Roanoke for further proceedings therein, &c.

On the 9th day of November, 1891, the Circuit Court of the city of Roanoke dissolved the injunction and dismissed complainant's bill. And it is from this decree that an appeal was allowed to this court by one of its judges, and to operate as a supersedeas.

The material facts in the case are fully set out in the pleadings, and not controverted, and in addition, there is an agreement of facts between the parties, reduced to writing, and made a part of the record. That we may fully understand the *locus in quo,* it will be necessary to refer here particularly to the following, among the facts agreed on, namely:

"That the approach at Randolph street starts at a grade at the northern side of Campbell street, and rises to a height of thirteen feet at the northern side of Salem avenue, which is of dirt, and is in Randolph street; that in Randolph street, is a stone structure, commencing at the northern side of Salem avenue, at the height of thirteen feet, of thirty-five feet in width, and extending to within sixty or sixty-five feet of the northeast corner of Railroad avenue, and Randolph street, and rising to a height of sixteen feet; that this approach and structure do not extend to either side of the street, but leave on each side of the structure about seven and a half feet on Randolph street, unoccupied, available for the use of the complainant and the public in approaching to the complainant's lot on Randolph street; that from the northern end of the stone structure to the line of Railroad avenue, the superstructure rises from sixteen to eighteen feet at the south line of Railroad avenue, and that a few feet south of the south line of Railroad avenue on Randolph street are two columns supporting the superstructure; that on the south side of Railroad avenue and on the north line of the curb of that street, rises the stairway or foot approach to the bridge, extending from the east line of lot No. 18 to bridge."

Upon the agreed facts and those proven in the record, the case stands thus:

The Norfolk and Western Railroad Company, in operation now nearly a half century, doing an immense business in passenger and freight traffic, traverses the entire length of the city of Roanoke from east to west, a city that has developed from a way station with a few residences around to a city of some twenty thousand inhabitants almost within a decade, with a portion of the inhabitants of the city on the south side, and the remainder on the north side of the tracks; that for a great distance, including the point where Randolph street intersects Railroad avenue, a surface crossing from one side of the railroad to the other, was almost, if not entirely impracticable, in view of the number of tracks along the streets of the city at this point, over which there is a constant stream of passenger and freight trains, as well as yard engines; whereby, to say nothing of the constant danger to which the traveling public were subjected, free intercourse between the citizens of the city residing on different sides of the railroad was constantly interfered with. This situation being recognized by the city of Roanoke, it, as early as January 7, 1890, passed an ordinance submitting to the freehold voters the question of issuing bonds to the amount of $30,000, for the purpose of construcing the approaches to the bridges to be built across the Norfolk and Western Railroad track at three points, including the one at Randolph street; and, upon a vote being taken thereupon, on the 18th day of February, 1890, the freeholders almost unanimously approved of the issuing of the bonds. The bonds were issued and negotiated, and the prcceeds thereof in cash lay in the treasury of the city, less the amount expended in the prosecution of this work, up to the time of the service of the injunction in this suit. This is nowhere controverted in the record, and the work of building the approach to the bridge at Randolph street was begun in November, 1890, and

prosecuted till the injunction was actually served upon the city after September 14, 1891, while the deed to appellant for its property on Randolph street is dated June 18, 1890.

The appellant, in its petition for appeal to this court, makes a general assignment of error that the Circuit Court of Roanoke erred in dissolving the injunction granted in this cause by Hon. B. W. Lacy, one of the judges of this court, and in dismissing petitioner's bill. This brings up the questions raised by the original bill filed in the lower court, all of which hinge upon whether the construction by the city of Roanoke of the approach to the overhead bridge in Randolph street, without compensation to the appellant as an abutting lot owner, is the taking of the property of appellant without compensation within the meaning of section 14, of article 5, of the Constitution of Virginia. In other words, has the city of Roanoke transcended the authority conferred upon it by its legislative charter, in placing the approach to the bridge in Randolph street in the manner in which it is constructed?

The 5th sub-division of section 18 of the charter of the city of Roanoke (Acts of 1883-4, page 91), gives to the city of Roanoke the power "to close or extend, widen or narrow, lay out, graduate, curb and pave, and otherwise improve streets, sidewalks, and public alleys in said city and have them kept in good order and properly lighted; and over any street, or alley which has been or may be ceded or conveyed to the city by proper deed, they shall have like power and authority as over other streets and alleys; they may build bridges in and culverts under said streets, and may prevent or remove any structure, obstruction, or encroachment over or under any street, sidewalk, or alley in said city." * * *

Now it would seem clear, in fact it does not appear to be denied in this record, that this clause in the charter conferred upon the city full power and authority to erect the bridge across the railroad track at Randolph street; and therefore,

the question first to be determined is, did that authority extend to the building of the structure, termed the approach to the bridge in Randolph street? And just here it may be noted that it is nowhere claimed in this record that the work, in constructing said approach to the bridge in Randolph street, was being done in a negligent and unskillful manner, whereby the appellant's property has been injured. We are, therefore, to deal with the naked question whether the city of Roanoke had the right to build this approach in the manner in which the same is shown to have been done. The right of the city, under its legislative charter, to raise or to lower the grade of its streets is too well established in Virginia to admit of discussion here. *Smith* v. *City Council of Alexandria*, 33 Gratt. 208; and *Kehrer* v. *Richmond city*, 81 Va. 745.

Therefore had the city of Roanoke raised the grade of the entire surface of Randolph street in the construction of the approach to the bridge, the right to do so could not have been questioned. But the contention of the appellant here is that the structure, called the approach to the bridge, constitutes an additional servitude on the land, whereby the private property of appellant, as an abutting lot owner, is taken without just compensation; and, in support of this contention, the able counsel who argued its case before this court, cited numerous authorities which will be noticed later on. And further to sustain this contention, appellant asserts that the fee in the land to the middle of Randolph street belongs to it, but we do not see that it makes any material difference, in the determination of this case, whether the appellant ownes the fee in Randolph street, or whether the city of Roanoke holds it in trust for the use of the public. Cooley's Con. Lim. [552-5]; and *Barney* v. *Keokuk*, 94 U. S. 324; *Transportation Company* v. *Chicago*, 99 U. S. 641. The last named case was an action of trespass on the case by the Northern Transportation Company of Ohio against the city of Chicago, Ill., to recover

damages by reason of the construction by that city of a tunnel under the Chicago river along the line of La Salle street. Judge Strong, in delivering the opinion of the court in the case, says: "It is immaterial whether the fee of the street was in the State, or in the city, or in the adjoining lotholders. If in the latter, the State had an easement to repair and improve the street over its entire length and breadth, to adapt it to easy and safe passage."

"It is undeniable that, in making the improvement of which the plaintiffs complain, the city was the agent of the State, and performing a public duty imposed upon it by the legislature."

Judge Dayton, in delivering the opinion of the court in the case of *Freeholders of Sussex* v. *Strader*, 35 American Decisions, at page 532, defines *bridge* thus:

"The term 'a bridge,' conveys to my mind the idea of a passage way, by which travellers and others are enabled to pass safely over streams or *other obstructions*. A structure of stone which spans the width of a stream, but is wholly inaccessible at either end (whatever may be its architecture), does not meet my ideas of what is meant in law and common parlance by a bridge. Sound policy, moreover, requires that we so construe the law, as to compel those persons who erect the structure itself, to make it accessible at its ends. It is, then, that an available passage-way will be obtained for the public, when the body of the bridge itself, is completed."

It is true that in that case the right of the county of Sussex to build the bridge was not in question, the only question being who, if any one, was liable to Strader for the value of his horse that fell from a defective abutment and was killed. Yet, as we are to determine whether the city of Roanoke under its charter had the right to build the bridge across the railroad at Randolph street, we should understand what is meant by a bridge, which the charter of the city authorizes to

be built in any of its streets.    Hence this authority is perti-
nent, since it defines just what constitues a bridge.    The wis-
dom of the city authorities of Roanoke, in providing these
overhead bridges for the convenience and safety of its citizens,
is not questioned in this record.    Then, in the light of the
authority just cited, if the city of Roanoke, had the right under
its charter (which seems to us to be clear,) to build the bridge
in question, it not only had the right, but it was incumbent
on it to build the approach thereto.    Among the authorities
cited on behalf of appellant to sustain the contention that the
structure placed in Randolph street by the city is an additional
burden to the servitude of the street, for which the appellant
should be compensated, are the cases of *Story* v. *New York
Elevated Railway Company*, 90 N. Y. 122; *Pumpelly* v.
*Green Bay Company*, 13 Wall. 166; *Hodges* v. *Seaboard and
Roanoke Railroad*, 88 Va. 653; *Western Union Telegraph
Company* v. *Williams*, 86 Va. 696.

In each of those cases, the act complained of was committed
by a private corporation for private gain, and not for the
public good only.    There is, to our mind, a marked difference
between a private corporation, or any third party, though
claiming under the authority of the legislature the right to
place additional burdens upon the servitude of a public high-
way for private gain, and a public corporation clothed with
authority from the legislative power to improve its public
highways so as to make them more convenient and safer to
the traveling public.    2 Dillon on Mun. Corp. (4th Ed.), secs.
715 and 716; and on this point see opinion of this court in
*Hodges* v. *Seaboard and Roanoke Railroad*, 88 Va. 655,
where Hinton, Judge, says: "The easement of the public is
the right to use and improve the street for the purposes of a
highway only.    A railroad on the street, being foreign to
such purposes, is an interference with the adjoining owner's
property rights in the soil, and an acquisition or taking of an

estate or interest in his land, for which he is entitled to compensation as in other cases."

It is undeniable that the city of Roanoke, in making the improvement in Randolph street, of which appellant complains, was the agent of the State and performing a public duty imposed upon it by the legislature, "and that persons appointed or authorized by law to make or improve a highway are not answerable for consequential damages, if they act within their jurisdiction and with care and skill, is a doctrine almost universally accepted alike in England and this country." See opinion of Mr. Justice Strong in *Transportation Company* v. *Chicago,* 99 U. S. 641, and cases there cited.

This case, as we have seen, grew out of the construction of a tunnel under the Chicago river, along the line of La Salle street, under authority conferred upon the city by its legislative charter, and Mr. Justice Strong further says:

"The doctrine, however it may at times appear to be at variance with natural justice, rests upon the soundest legal reason. The State holds its highways in trust for the public.

Improvements made by its direction or by its authority are its acts, and the ultimate responsibility, of course, should rest upon it. But it is the prerogative of the State to be exempt from coercion by suit, except by its own consent. This prerogative would amount to nothing if it does not protect the agents for improving highways which the State is compelled to employ. The remedy, therefore, for a consequential injury resulting from the State's action through its agents, if there is any, must be that, and that only, which the legislature shall give. It does not exist at common law. The decisions to which we have referred were made in view of *Magna Charta* and the restriction to be found in the Constitution of every State, that private property shall not be taken for public use without just compensation being made. But acts done in the proper exercise of governmental powers, and not

directly encroaching upon private property, though their con-
sequences may impair its use, are universally held not to be a
taking within the meaning of the Constitutional provision.
They do not entitle the owner of such property to compensa-
tion from the State or its agent, or give him any right of
action.   This is supported by an immense weight of authority.''
Cooley on Con. Lim., page [*542,] and notes, and cases there
cited.   Proceeding further, this eminent jurist says:

"That the extremest qualification of the doctrine is to be
found, perhaps, in *Pumpelly* v. *Green Bay Company*, 13
Wall. 166, and in *Eaton* v. *Boston, Concord and Montreal
R. Co.*, 51 N. H. 504.   In those cases it was held
that permanent flooding of private property may be
regarded as a 'taking.'   In those cases there was a physical
invasion of the real estate of the private owner, and a practical
ouster of his possession.   But in the present case there was
no such invasion.''   So in the case here under consideration.

A case almost exactly similar to the one we now have under
consideration, has recently been decided by the Supreme Court
of Minnesota, and reported in the Northwestern Reporter,
Vol. 60, page 814, styled "Willis v. City of Winona.''   The
syllabus of that case is as follows:

"1st.   The city of Winona, under express legislative autho-
rity, constructed a public wagon bridge across the Mississippi
river, the Minnesota end of which reaches the river bank near
the foot of Main street, and at considerable height above the
natural level of the land.   For the purpose of connecting the
bridge, for the purposes of travel and traffic, with Main street
and other public streets, the city constructed an approach in
and along the centre of Main street, in front or plaintiff's
abutting lot.   This approach, which consists partly of solid
abutments, and partly of a plank-way supported by iron col-
umns, gradually ascends from the natural level of the street
at one end to the level of the bridge at the other.''

"2d. Held, that the construction and maintenance of this approach does not impose any additional servitude on the street, and does not render the city liable for damages to plaintiff's lot, in the absence of any negligence on the part of the city, and of any statute imposing such liability."   *   *   *

Judge Mitchell, who delivered the opinion of the court in that case, in summarizing the facts alleged, adds to what is stated in the syllabus:

"This approach commences in the centre of Main street, a short distance south of plaintiff's lot, and gradually rises until it reaches the height of about twenty-five feet opposite the north end of the lot.   This approach is twenty-four feet wide, leaving a portion of the street on each side at the former grade.   It is covered with plank and is supported by abutments and columns of iron and stone.   The construction and maintenance of this approach have materially reduced the value of the plaintiff's lot, but there is no allegation that it touches the body of the plaintiff's lot, or that it was negligently constructed, or in any manner not expressly authorized by the act of the legislature."   And upon his statement of what the act of the legislature, that is the charter of the city, provides with reference to private property taken, &c., it fully appears that it is in effect the same as section 23 of the charter of the city of Roanoke, relied on by appellant.   The basis of the claim asserted by Willis against the city of Winona for damages, was, as in the case here, based on two grounds : 1st. That the Act of 1891 (the charter of Winona), authorizing the building of this bridge, imposes upon the city a positive duty to pay such damages; and, 2d. That the construction of this bridge-approach has imposed an additional servitude upon the street upon which plaintiff's lot abuts.

But the court held, in its strong opinion, supported by numerous authorities cited, that taking all of the provisions of the act (that is the charter of Winona) together, it was not

intended to impose upon the city a liability to pay damages
where none already existed, but merely to provide a method
of ascertaining and paying damages for such taking of private
property as, under existing law, entitled the owner to com-
pensation, and that the construction and maintenance of the
bridge-approach is not an additional servitude on the street,
for which the plaintiff could recover damages, saying, that
"the doctrine of the courts everywhere, both in England and
this country (unless Ohio and Kentucky are exceptions), is
that, so long as there is no application of the street to pur-
poses other than those of a highway, any establishment or
change of grade made lawfully, and not negligently performed,
does not impose an additional servitude upon the street, and
hence is not within the constitutional inhibition against taking
private property without compensation, and is not the basis
for an action of damages, unless there be an express statute to
that effect.

Stress is laid by appellant's counsel upon section 23 of the
charter of the city of Roanoke, as imposing the duty upon the
city to compensate appellant for the taking of its property by
the construction of the approach to Randolph street bridge, and
in like cases, but we think that that section of the charter refers
to the acquisition of property for the opening of new streets,
the extension of those already opened or dedicated, and to the
building or establishment of work-houses, houses of correction,
and other buildings or improvements contemplated in the char-
ter; and if section 23 has any application to appellant's case,
it is, after all, but the embodiment of the established law of
the State, and only provides a method of ascertaining and pay-
ing damages for the taking of private property under existing
law, where the owner is entitled to compensation.

So, after as careful examination of the authorities reported
in other States and the Federal Reports as we could give, we
conclude that, since we find from the authorities cited, *supra*,

the building of an approach to a bridge authorized by law to be built is but the grading of the street to adapt it to the uses and needs of the public, the determination of the case under consideration must be governed by the rulings of this court in the cases of *Smith* v. *City Council of Alexandria*, 33 Gratt. 208, and *Kehrer* v. *Richmond City*, *supra*. The doctrine laid down in those cases is stated clearly by Judge Burks in the first named case, as follows:

"The validity of this legislative act, similar to the charters of most of our cities and towns in respect to streets, has not been and cannot be questioned, and the city council having full discretionary power thereunder to improve the streets of the city by grading them, the *due exercise* of the power cannot, in the nature of things, be wrongful, in a legal point of view; and hence, although it may be attended or followed by damage, as a necessary incident, to the owners of adjacent lots, such damage is what is known in the law as *damnum absque injuria* and imposes no legal liability." 33 Gratt. 211; Dillon on Mun. Corp. secs. 989 and 990. The opinion of the court by Lewis, P., in *Kehrer* v. *City of Richmond*, 81 Va. 745, but emphasizes the doctrine, a doctrine that we admit appears harsh, and may be really so, when applied to some cases, but it should be remembered that it is not the province of this court to make the law, but rather to enforce it.

It is, however, contended by appellant that because section 50 of the charter of Roanoke requires all contracts for the erection of public improvements or buildings within the jurisdiction of the city council to be let to the lowest responsible bidder, after notice, &c., all the acts and doings of the city, in connection with the building or construction of the bridge-approach in Randolph street, are manifestly contrary to law, and illegal—*ultra vires*. We see nothing in that clause of the charter which inhibited the city from constructing public buildings or improvements under direction of its own engineers

and officers.   It simply provides that when such buildings or improvements are let to contract, it shall be to the lowest bidder, and after advertisement, as provided.   Any other construction of that provision would prove dangerous, if not injurious, to any city, since we see from this record that if that construction had been followed, the approaches to the overhead bridges in the city of Roanoke would have cost the city $8,000, or $10,000, more than they will under the mode of construction adopted by the city.

Upon a review of the whole case, and for the reasons stated, we are of opinion that the judgment of the Circuit Court of Roanoke city, dissolving the injunction awarded in the case, and dismissing appellant's bill, is clearly right in all respects, and must be affirmed.

AFFIRMED.