COMMONWEALTH *vs.* HUGH J. MORRISON.[*]

Suffolk.    November 18, 1907. — January 21, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Way, Public. Lunch Wagon. Hawkers and Pedlers. License. Municipal Corporations, By-laws and ordinances. Words, "Hawkers and pedlers."*

A license or permit to carry on the business of hawker and pedler, properly issued by authorities duly empowered to issue it, does not justify the holder thereof in maintaining a lunch wagon for hours at a time at one place within the limits of a highway.

As a matter of common knowledge, as well as according to the definition in R. L.

---

[*] After this decision was rendered, St. 1908, c. 360, was passed, providing for the licensing, under specified conditions, of any reputable person to maintain " a vehicle for the sale of food " in a part of a public highway, "provided that public travel is not incommoded thereby " and provided that no part of a highway, the fee in which is not owned by the city or town, shall be used unless the owners of land abutting thereon consent in writing to the granting of the license.

c. 65, § 13, hawkers and pedlers are persons who travel about, either on foot or in wagons, carrying and exposing goods for sale, and generally, although not necessarily, attracting attention to their wares by outcry, sign or advertisement. By Revised Ordinances of Boston of 1883, c. 24, § 3, and Revised Ordinances of 1895, c. 26, § 1, enacted under authority of St. 1885, c. 323, the board of police commissioners of that city were given the powers formerly vested in the board of aldermen or the mayor and aldermen in relation to licensing, regulating and restraining hawkers and pedlers, carriages, wagons and other vehicles, and such a license given in 1894 by the board of aldermen was of no effect.

The maintenance for personal profit within the limits of a highway of a lunch wagon consisting of a room set upon wheels containing a lunch counter and seats for customers, a stove, an urn for making coffee and windows through which, as well as at the counter, customers were served, which was drawn by a horse to a certain place upon the highway each night except Sunday at 6.30 o'clock and remained there until 5 o'clock the next morning, the horse being removed in the meantime, was *held* to be an obstruction of the easement of the public to the use of the way, and therefore not to be justified although the owner of the lunch wagon had received a permit from officers of the municipality in which the highway was who assumed to act under authority conferred by an ordinance, there having been no legislative authority for the ordinance.

COMPLAINT, taken and sworn to in the Municipal Court of the City of Boston December 29, 1905, for obstructing Adams Square, a highway in Boston.

On appeal to the Superior Court, the case was tried on agreed facts before *Brown,* J., upon whose refusal to direct a verdict of not guilty, the defendant submitted to a verdict of guilty, and the presiding judge reported the case for determination by this court.

The facts are stated in the opinion.

The case was submitted on briefs.

*J. R. Murphy & W. A. Buie,* for the defendant.

*M. J. Dwyer,* Assistant District Attorney, for the Commonwealth.

RUGG, J.   The defendant is complained of for obstructing a highway in the city of Boston.   The facts are that the defendant kept a lunch wagon upon a public way, known as Adams Square, in the night time.   This wagon was a rectangular box-like structure, placed upon the four-wheel running gear of an ordinary wagon, and was drawn to Adams Square by a single horse harnessed into the wagon shafts in the usual way.   The upper structure of the wagon had a door, or entrance, about midway on one side.   There were six windows on one side and five on the other, and three on each end.   The inside was fitted up with a counter at one end, behind which was a stove and an urn for

making coffee and in front of which were six stools, on which people sat while eating. The rest of the interior was left empty for standing room. Every night, Sundays excepted, in the month of December, 1905, at about 6.30 o'clock, the wagon was placed in the same spot in Adams Square, and the horse was taken out and led away. About five o'clock each morning the horse was brought back, harnessed to the wagon and driven off. During the night the wagon remained in the same place, and was resorted to by people for food. The defendant served various kinds of foods to customers, who entered and ate in the wagon, and to others in the street, who were waited on through the openings in the side.

The defendant attempted to justify his acts by a permit issued to him in 1894 by the board of aldermen of the city of Boston, to stand a wagon in Adams Square between the hours of 6 P. M. and 5 A. M., and under licenses as a hawker and pedler from the street department and the board of health of the city of Boston. We assume that the licenses or permits issued to the defendant as hawker and pedler by the health department and the street department were properly issued pursuant to a legal ordinance covering the subject, and that, notwithstanding considerations hereinafter discussed, it is within the jurisdiction of the city council of the city of Boston to enact limiting ordinances respecting hawkers and pedlers. *Commonwealth* v. *Ellis,* 158 Mass. 555. *Commonwealth* v. *Reid,* 175 Mass. 325. Standing alone, the licenses or permits as hawker and pedler gave the defendant no authority to set up a lunch wagon within the limits of the highway for hours at a time, nor to commit any obstruction in the public street. The character of the business conducted by the defendant, which was always at a fixed place and from a room, which, although set upon wheels, had characteristics of a shop or eating house, does not come within the description of business done by hawkers and pedlers, who, as a matter of common understanding as well as of statutory definition (R. L. c. 65, § 13), are persons who travel about, either on foot or in wagons, carrying and exposing for sale goods, and generally, though not necessarily, by outcry, sign or advertisement, attracting attention to their wares. *Commonwealth* v. *Ober,* 12 Cush. 493. *Commonwealth* v. *Hana,* 195 Mass. 262. The licenses as hawker and

pedler are no greater protection to the kind of business which the defendant carried on than they would be to a common victualler.

A short answer to the defendant's further contention, that he is protected by the permit from the board of aldermen, is that the board of aldermen had no jurisdiction to grant the permit upon which he relies, even if we assume that the defendant's place of business can be properly comprehended within the generic phrase, carriage, vehicle, wagon, cart or coach. The first statutory provision respecting this subject appears to be in St. 1799, c. 31, § 7, although there were earlier acts respecting hackney carriages, St. 1795, c. 51, St. 1796, c. 32. This statute imposed a fine for permitting "any Cart, Waggon, Stage or Hack Coach, Stage Waggon or other Carriages, new or old, finished or unfinished" to remain more than one hour in any street, lane or alley in Boston without permission of the surveyors of highways, with a provision, manifestly intended for the protection of country folk, that no prosecution should be commenced "against any Driver of any Cart or Waggon coming from the country" unless specially directed. This section was repealed by St. 1847, c. 224, § 3, other sections of which chapter conferred upon the mayor and aldermen of cities general power for the regulation of all sorts of carriages and vehicles. St. 1878, c. 244, authorized the appointment of a board of police commissioners by the mayor for the city of Boston, and empowered the city council to confer upon such board all the powers possessed by the board of aldermen "in relation to licensing, regulating and restraining, . . . hawkers and peddlers, carriages, wagons and other vehicles." Acting apparently upon the authority conferred by this section, c. 24, § 3, of the Revised Ordinances of the city of Boston of 1882, being the eighth revision, provided that the board of police commissioners "shall have and exercise all the powers conferred by the statutes of the Commonwealth and the ordinances of the city upon the board of aldermen or upon the mayor and aldermen, in relation to licensing, regulating, and restraining . . . hawkers and peddlers, carriages, wagons and other vehicles." So far as this subject is concerned, substantially the same provision is contained in c. 26, § 1, of the Revised Ordinances of 1885, being the ninth revision. By

St. 1885, c. 323, a board of police was created for the city of Boston to be appointed by the Governor of the Commonwealth. Section 2 of this act conferred upon the board of police "all the powers now vested in the board of police commissioners in said city of Boston by the statutes of the Commonwealth or by the ordinances, by-laws, rules and regulations of said city," with exceptions not here material.     See St. 1906, c. 291, §§ 4 and 10. These provisions of the statutes and ordinances were in force during the period covered by the complaint.     It is clear that, if the defendant was either a hawker or a pedler or operating a carriage, wagon or other vehicle, he could justify his actions only by showing a license from the board of police of Boston. This he did not have and his justification fails.

But the ruling of the court below was correct upon broader grounds.     The device which the defendant maintained, although mounted upon wheels, was in fact a small room used for an eating house and kept constantly at one place in the street for over ten consecutive hours.     During this time no horse was attached and no use was at any time made of the wheels except to drag the cart to and from its place in the public way.·     The public secure by the location of a highway an easement of passage, with all the powers and privileges which are necessarily implied as incidental to its exercise.     The easement is coextensive with the limits of the highway.     The fee of the land remains in the landowner, who may make any use of it not inconsistent with the paramount right of the public.     *Como* v. *Worcester*, 177 Mass. 543.     The easement acquired by the public includes every reasonable means of transportation for persons and commodities, and of transmission of intelligence, which the advance of civilization may render suitable for a highway.     Under this description, gas and water pipes, sewers, telephone, telegraph, electric light and power poles, wires and conduits, electric and horse railways, the Boston subway and private railroads have been permitted within the limits of highways.     *Pierce* v. *Drew*, 136 Mass. 75.     *Howe* v. *West End Street Railway*, 167 Mass. 46.     *Allen* v. *Boston*, 159 Mass. 324.     *White* v. *Blanchard Bros. Granite Co.* 178 Mass. 363.     *New England Telephone & Telegraph Co.* v. *Boston Terminal Co.* 182 Mass. 397.     *Boston Electric Light Co.* v. *Boston Terminal Co.* 184 Mass. 566.     *Lorain Steel Co.* v.

*Norfolk & Bristol Street Railway*, 187 Mass. 500. *Eustis* v. *Milton Street Railway*, 183 Mass. 586. *McDermott* v. *Warren, Brookfield & Spencer Street Railway*, 172 Mass. 197. *Sears* v. *Crocker*, 184 Mass. 586. *Natick Gas Light Co.* v. *Natick*, 175 Mass. 246. *Williams* v. *Old Colony Street Railway*, 193 Mass. 305. *Hyde* v. *Boston & Worcester Street Railway*, 194 Mass. 80. But, notwithstanding these various instrumentalities, they are all manifestations in divers forms of the right of travel of persons, the transmission of intelligence and the transportation of commodities. The primary purpose of a highway is the passing and repassing of the public, which is entitled, so far as needed, to the full, unobstructed and uninterrupted enjoyment of the entire width of the layout for that purpose. Whenever the public does not have occasion to exercise its easement to its full extent, the owner of the fee may make any use not inconsistent therewith. Whatever interferes with the exercise of this easement is a nuisance. *Commonwealth* v. *King*, 13 Met. 115, 118. *Commonwealth* v. *Wilkinson*, 16 Pick. 175. *Gifford* v. *Westport*, 190 Mass. 323. *Tinker* v. *New York, Ontario & Western Railroad*, 157 N. Y. 312. The stands of hackney carriages may perhaps be justified as a phase of public travel, (*Commonwealth* v. *Matthews*, 122 Mass. 60,) and the use of streets in connection with markets, in view of long continued customs in Boston and perhaps elsewhere in this Commonwealth, as incidental to the transportation of merchandise, *Commonwealth* v. *Brooks*, 109 Mass. 355, and possibly also in connection with the establishment of a public market, *Spaulding* v. *Lowell*, 23 Pick. 71, *Kinney* v. *Robison*, 49 Mich. 247. Whether carriage and truck wagon stands can be authorized against the protest of an abutting owner may be open to doubt. See *Branahan* v. *Hotel Co.* 39 Ohio St. 333; *Lippincott* v. *Lasher*, 17 Stew. (N. J.) 120; *McCaffrey* v. *Smith*, 41 Hun, 117. Hawking and peddling is also an illustration of a legitimate use of the highway. It consists of transportation of merchandise, and the stops for sale are brief and ordinarily not of such character as to constitute any substantial obstruction to the rights of travellers. The business of the defendant does not come within any description of travel, nor does it have a necessary or reasonably natural connection with the passing of persons or the transportation of commodi-

ties. The establishment in highways of drinking fountains, R. L. c. 25, § 15, *Cushing* v. *Bedford*, 125 Mass. 526, erection of guide boards, R. L. c. 52, §§ 1, 2, 3, St. 1906, c. 234, *Sharon* v. *Smith*, 180 Mass. 539, and planting and protection of shade trees, R. L. c. 25, § 15, *Washburn* v. *Easton*, 172 Mass. 525, *Hall* v. *Wakefield*, 184 Mass. 147, have all been expressly authorized by statute, and bear an obvious relation to the convenience, comfort and pleasure of travel. The obstruction they offer to the use of the entire way for passage is ordinarily trifling, and they have been regarded as legally incidental to the general purpose for which the public easement of travel has been taken from the private owner by eminent domain. But eating, although necessary for human beings, is no more essential to their welfare than sleeping or clothing or cleanliness, nor does it bear any closer relation to travel upon highways than any of these other human functions. It could not be contended that the establishment on wheels of lodging houses, provision or furnishing stores, or bath rooms, to be drawn and left for considerable periods of time at fixed places in the highway, was fairly comprehended within the description of travel upon the highway. *Haberlil* v. *Boston*, 190 Mass. 358. It may well be that the present instrumentalities or methods of travel do not necessarily exhaust the range of uses to which highways may be put, but the acts of the defendant do not belong to the class of purposes for which ways have been established. Moreover, the defendant is appropriating, for purely personal profit, a substantial portion of what has been procured from private owners at the public expense for a wholly public use. He is plying his vocation at a particular place within the limits of the highway for several hours at a time, night after night. In a limited way he is doing the same sort of service as innkeepers and common victuallers. Therefore, no municipal ordinance can afford him a shield of protection against prosecution for an obstruction to travel upon a public way. *Cohen* v. *Mayor of New York*, 113 N. Y. 532. *Commonwealth* v. *Millinian*, 13 Serg. & R. 403. *Blodgett* v. *Boston*, 8 Allen, 237. *Commonwealth* v. *Wentworth*, 4 Clark, (Pa.) 324. See *Keith* v. *Easton*, 2 Allen, 552.

*Verdict to stand.*