# Richmond.

## JOHN W. MCCLINTOCK AND WIFE v. RICHLANDS BRICK CORPORATION AND OTHERS.

November 15, 1928.

The opinion states the case.

*J. W. Harman* and *Walter M. Elswick*, for the appellants.

*Spratt & Spratt* and *George C. Peery*, for the appellees.

PRENTIS, C. J., delivered the opinion of the court.

The outstanding facts in this case may be thus stated: The appellants, then residing at Jewell Ridge, Tazewell county, own two adjoining vacant lots, the westerly side of one of which abuts upon Virginia street, in the town of Richlands, in that county, upon which street the Richlands Brick Corporation has constructed a tramway, or railway, for the purpose of hauling clay and shale in tram cars to its brick kilns for the manufacture of brick. Their claim of the right so to use the street is based upon a special act of the General Assembly and an ordinance of the town passed pursuant thereto. The act reads:

"An act to authorize the town council of the town of Richlands, Virginia, to grant to any person, firm or chartered company, engaged in mining, manufacturing or merchandising, a right of way for the construction, operation and maintenance of a tramway or railway, across, upon or along any of the avenues or streets of said town, subject to such regulations as the said town council may prescribe.

"Approved February 12, 1926.

"1. Be it enacted by the General Assembly of Virginia, That the town council of the town of Richlands, in Tazewell county, Virginia, be and it is hereby, authorized, subject to the provisions of section one hundred and twenty-five of the Constitution of Virginia, and the general laws enacted in pursuance thereof, to grant to any person, firm or chartered company engaged in mining, manufacturing or merchandising, a right of way for the construction, operation and maintenance of a tramway or railway across, upon or along any of the avenues or streets of said town, for a period not to exceed thirty years, subject to such regulations for the

protection of the public as the said town council may prescribe.

"2. An emergency existing, this act shall be in force from its passage." (Acts 1926, page 28.)

Upon this tramway, or railway, the brick company operates a small steam engine, called a "dinkey," with dump cars, by which clay, shale and like materials for the manufacture of brick are transported.

The town council, by written petition, signed by a very large number of citizens, representing the property and business interests of the town, were urged to accord the privilege. Included among the petitioners were all of the owners of property on Virginia street, except the five original complainants, three of whom have since had the suit dismissed as to them, without prejudice, and with the right reserved hereafter to institute suits or actions at law against the defendant, as they may be advised. So that we need only consider the claims asserted by these two appellants.

■ The case was heard on the bill and answer, the result of which is "to admit the truth of all matters of fact sufficiently pleaded in the answer, whether responsive to the bill, or whether in confession and avoidance; and to submit to the court the decision of the question whether on the facts as they appear from the answer, the decree should not go in favor of the plaintiff.

"In short, going to hearing on the bill and answer is, for some purposes, practically the same as a demurrer at law to the plea.

"Since this course on the part of the plaintiff excludes any opportunity on the part of either party to take testimony, there is good reason for the rule that the plaintiff thereby admits the truth of all facts set up in the answer relevant to the case stated in the bill. * * *

"On such hearing, if the answer is held insufficient in law as a defense to the bill, the plaintiff is entitled to a decree. If, on the other hand, the answer is held sufficient, the bill is dismissed. Hence the result is decisive for one or the other of the parties." Lile on Eq. Pl. & Pr., sections 249-250.

The facts set up in the answer show that the grant to the brick corporation was the permission to construct and operate a tramway not exceeding twelve feet in width, the street being sixty feet wide, except that immediately after it passes the southwest corner of one of the lots of complainants the width narrows to thirty feet, and the tramway is on the part of the street farthest away from the side of one of the two vacant lots of the appellants. All of the owners of lots on the far side of the street apparently assent to the construction and operation of the tramway. It was at the instance of the citizens of the town that the special act in question was adopted. If valid, it authorizes the municipality "to grant to any person, firm or chartered company engaged in mining, manufacturing or merchandising, a right of way for the construction, operation and maintenance of a tramway or railway across, upon, or along any of the avenues or streets of said town for a period not to exceed thirty years, subject to such regulations for the protection of the public as the said town council may prescribe," and subject to the provisions of section 125 of the Constitution.

Section 125 of the Constitution forbids the granting of such franchises, leases or right to use any public property or easement of any description in a manner not permitted to the general public, without first advertising for bids publicly, or for a period longer than thirty years. Among its provisions is this: "Every such grant shall specify the mode of determin-

ing any valuation therein provided for, and shall make adequate provision by way of forfeiture of the grant or otherwise, to secure efficiency of public service at reasonable rates, and the maintainance of the property in good order throughout the term of the grant.''

The franchise granted was accordingly advertised and so offered.

The brick corporation was the only bidder, and received the grant for the nominal consideration of one dollar, upon the condition that it should grade the street under the supervision and in accordance with the specifications of the council and pursuant thereto. According to the allegations of the answer, the grantee proceeded to grade the street, converting it from an ungraded and little used street into a usable, serviceable street, capable of handling many times the traffic that would want to use it; that it is thereby made more accessible and easier to travel than before, all of which confers distinct advantages to the property along the street, tends to enhancement of values, and results in convenience and benefits to the owners thereof, which is recognized by all of them except the appellants. The track is narrow gauge, laid on light rails let down into the surface of the street.

It is said in the brief that the town contains some 800 or 1,000 inhabitants; that the brick plant is the only local enterprise of consequence, and it is averred in the answer that it employs about seventy-five men, who with their families constitute 300 persons (or perhaps one-third of the population of the town). Its pay roll is about $6,000 per month for labor and its average expenditures about $10,000 per month; that its operation is beneficial to the town and adds materially to the value of all residential property therein. The brick corporation, before the granting of this franchise,

had exhausted the material for the manufacture of the brick which it owned in that locality, and was contemplating the necessity of moving from the town. The people of the town, as a matter of public concern, prevailed upon the corporation to continue its operations there. As a consequence the brick corporation then purchased a small tract of land, lying at the east end of Virginia street, which contained material suitable for its purposes. The plant being located in the town but west of this tract of land, the only feasible way of utilizing the clay thereon is by transporting it by some means over the part of Virginia street in which this tramway is being operated. Prior to this time the street had neither been graded nor improved, and there was no prospect that it would at any time in the near future be so improved or used to any considerable extent.

In view of the conceded facts of the case, the grievances of appellants are alleged in the bill and restated in their briefs in somewhat fanciful and exaggerated language—that is, the averments are as though the Richlands Brick Corporation were operating a transcontinental line of railway, and as though the resulting damages were such as would be imposed upon owners of property abutting the streets of a residential section of a populous city. In their brief, however, the appellants' council are somewhat more restrained, and state the true issue thus: "The gist of this suit does not turn upon the amount of damages, but is for an invasion of a legal right."

The trial court denied the injunction prayed for, and dismissed the bill, and the complainants appeal.

The case has been elaborately argued, and involves questions which have exercised the courts for many years. We shall not undertake to state, follow, or dis-

cuss, all of these questions, upon most of which we believe everything has been said which can be profitably said by the courts of this country. Decisions and judicial expressions to sustain almost any specific contention which can arise as to the varied uses of streets may be found in the books.

As is truly said in the brief for the appellees, however, there are two main propositions asserted for the appellants: First, the contention that the act is invalid because it authorizes the taking or damaging of private property for private purposes; and, secondly, that it is special or class legislation, prohibited by section 63, clause 18, of the Constitution, which provides: "The General Assembly shall not enact any local, special, or private law in the following cases: * * *

"18. Granting to any private corporation, association, or individual any special or exclusive right, privilege or immunity. *. * *"

1. Taking up the first contention, that the act authorizes the taking or damaging of private property for private purposes: It is conceded that the owners of the abutting lots own the subjacent fee, but that there is an easement which entitled the public to use the street for all appropriate street purposes. Considering the case in this phase, then, because of its public importance, the question is whether this tramway, so operated, constitutes an additional servitude, a taking or damaging of the fee, and is therefore an infringement upon the rights of the owners of the fee.

It may be said in general terms, as settled, that the maintenance and operation of a local street railway in a public street or highway, permitted by legislative authority, whatever the motive power, and whether it transports freight or passengers, or both, which would be otherwise carried through the streets by other means,

does not constitute an additional servitude on such streets, and no property right of the owners of the abutting lots is thereby invaded. On the other hand, it is equally well settled that the operation of a commercial railroad, by which is meant a railroad which is not a mere local facility, but one which collects freight and passengers from remote points and carries persons and property through the streets of a city, which would not otherwise be there transported, is an additional servitude which the owners of the fee in the street may enjoin if their property rights are not respected. The reasons for this distinction have been frequently stated. They are, in substance, that when the street is established, the public thereby acquires the right to use it for public purposes by every appropriate means, whether or not those means were customary or even known at the time the street was established; and so such local street railways, which handle local freight and local passengers, are simply carrying through the streets such persons and property as would be transported there by some other means if the street railway did not exist. This idea of the right to utilize changed methods and new vehicles of transportation has been developed, starting with the small street car drawn by a single horse, and from time to time subsequently enlarged until it may now be said that the right includes any appropriate means of transportation which may be used for the public convenience. On the other hand, the commercial street railway, which transports through the local streets persons and passengers which would not otherwise be there so transported, does impose an additional servitude.

The only Virginia cases which it is necessary to cite are: *Hodges* v. *Seaboard, etc. R. Co.*, 88 Va. 653, 15 S. E. 380; *Reid Bros.* v. *Norfolk City R. Co.*, 94 Va. 117,

26 S. E. 428, 36 L. R. A. 274, 64 Am. St. Rep. 708; *Wagner* v. *Bristol Belt Line Co.*, 108 Va. 594, 62 S. E. 391, 25 L. R. A. (N. S.) 1278; *Port Norfolk Land Co.* v. *Portsmouth St. Ry. Co.*, 5 Va. Law Reg., November 1899, page 477.

Considering the "verities of the situation," the actualities of this case, and disregarding such of the alleged grievances as are unreal, it is clear that this case differs from any which this court has ever been called upon to consider. It illustrates the cautionary observation of that great logician (Dillon), who concludes his discussion of the general subject with this observation:

"In conclusion, we may observe that the profound wisdom of Chief Justice Hale's observation was never more strikingly exemplified than by the course of decisions on the subject under consideration. 'Time,' he says, 'is the wisest thing under heaven. It is most certain that time and long experience is much more ingenious, subtile, and judicious, than all the wisest and acutest wits coexisting in the world can be. It discovers such varieties of emergencies and cases, and such inconvenience in things, that no man would otherwise have imagined.' The value of our system of law, as we now have it, is that it embodies the wisdom of time and experience. It is perhaps not too much to say that not until it was sought to use public streets, not only for surface railways but for elevated and underground railways, and other modern uses, did the exact nature of these respective rights come to be thoroughly considered. Good fruit in the law, as in the natural world, is the product alone of patient cultivation. It ripens slowly, and can be gathered only at the appointed time. The exact state of the law on this subject in any given State can only be understood

by a critical study of its special constitutional and legislative provisions, and line of judicial decisions—a general view of which we have sought to give in this chapter and elsewhere in the present work." 3 Dillon on Mun. Corp. (5th ed.), section 1281, page 2086.

The general rule being that the maintenance of an ordinary steam railroad upon a public street imposes an additional servitude for which the owner of the subjacent soil must be compensated, the appellants are here relying upon that rule and the unquestioned authority and reasons which sustain it, to support their contention that their rights as owners of the fee have been invaded, and that they have the right to enjoin the operation of this tramway upon that ground.

The courts, however, have frequently (and there are several modern cases) held that the mere fact that there is a steam engine drawing cars does not necessarily show that the facility is an ordinary commercial railroad, which is prohibited; and that the mere fact that the specific use of the street is granted primarily for private use and benefit does not of itself show that such use is an additional servitude.

Among the cases we find *White* v. *Blanchard Bros. Granite Co.* (1901), 178 Mass. 363, 59 N. E. 1025. The plaintiff there owned the fee and a quarry company, pursuant to statute, with consent of the municipal authorities, constructed and maintained a railroad on the highway for the transportation of stone from the quarry of the company to a steam railroad about a mile distant, for distribution to purchasers. The cars were drawn by horses   It was held that this was not an additional servitude of which the abutter could complain; that the statute which permitted a person or corporation to construct such a railroad upon the highway for private use, and the transportation of freight, subject

to the approval and regulations of the municipal authorities, is constitutional; that where, with consent (authorized by statute) of the municipal authorities, the freight horse railroad was constructed by the quarry company for the transportation of its products, such grant and use were not a taking of any of the property of the owner of the fee in the highway; that the transportation of such stone over the highway by the quarry company was done by it as one of the public under proper regulations by the selectmen; and suggested that it might be better for the preservation of the road and more for the interest of the public that the stone be so carried over the road on iron rails than that the surface of the highway should be destroyed by the wheels of heavily loaded wagons

The case of *Kipp and others* v. *Davis-Daly Copper Co.*, 41 Mont. 509, 110 Pac. 237, 36 L. R. A. (N. S.) 666, 21 Ann. Cas. 1372, is pertinent. There the fee in the street was in the public, and not in the abutting landowners. As to this fact the court said: "But it is not important to inquire where the fee is vested. The respective rights of the abutting owner and the public are dependent upon the fact of dedication. In view of these provisions as well as of the rule of law recognized everywhere, the authorities which control streets and highways may use or permit the use of them in any manner or for any purpose which is reasonably incident to the appropriation of them to public travel and to the ordinary uses of streets or highways under the different conditions which arise from time to time. For a highway is created for the use of the public, not only in view of its necessities and requirements as they exist, but also in view of the constantly changing modes and conditions of travel and transportation, brought about by improved methods and required by the increase of population

and the expansion in the volume of traffic due to the ever-increasing needs of society."

■ There was no specific statute involved in that case, but the general la wor character vested the municipal authorities with control of the streets and highways. Their authority was general, but it was held that they might permit the streets to be used in any manner or for any purpose reasonably incident to the appropriation of them to public travel, not only in view of the necessities and requirements of the public as they existed at the time the highway was created, but also in view of the constantly changing modes of travel and transportation brought about by the increase of population and expansion in the volume of traffic. Therefore, a mining company was permitted to construct a railroad over the streets entirely within the limits of the city of Butte, for the carriage of its supplies, ores, etc., which would otherwise necessarily be conveyed by teams, and it was held that this was not a commercial railroad as distinguished from a street railroad, and that such contemplated use of the city's streets falls within their ordinary uses; and that no additional servitude is thereby imposed upon the streets for which compensation must first be paid to the owners of the abutting property. While abutting owners may suffer inconvenience, and their property may be depreciated in value by the use of the street for particular purposes (e. g., for travel by certain classes of vehicles, or in one direction only), still if such uses are legitimate, properly authorized or limited, and such as can be fairly presumed to have been in contemplation when the street was created, there is no legal damage or legal injury. The court there called attention to the fact that mining is a dominant industry in the State of Montana; that in some localities it is the all-important industry;

and that the prosperity of the State had been due in large measure to it, and many other industries and business enterprises are almost entirely dependent upon it; and that, therefore, the purpose for which the defendant was to build the railroad in that case was in the nature of a public use.

In *Mordhurst* v. *Ft. Wayne & S. W. Traction Co.*, 163 Ind. 268, 106 Am. St. Rep. 222, 71 N. E. 642, 66 L. R. A. 105, 2 Ann. Cas. 967, it was held that the operation of an interurban railway by electric power through a city street, upon a track constructed of "T" rails, with authority to convey passengers, baggage, mail and light express, with a limited number of cars, did not impose an additional burden upon the abutting property. The court there said: "The carriage of light express matter, passenger baggage, and mail matter upon street cars would not constitute ground of complaint on the part of abutting lot owners. If only one car is run, the street is occupied and obstructed by it to no greater extent than it would be by a street car If two constitute a train, they will take up no more space and do no more injury than a motor car and trailer, which are commonly run upon street railroad tracks when the business of the company requires such additional car. The fact that light express matter, passenger baggage, and United States mail matter are carried on a car does not affect the property owner, nor injure his property. The transportation of articles of this kind does not create any resemblance between the interurban electric railroad and a steam railroad carrying ordinary goods and merchandise, and results in none of the annoyances and injuries which are caused by either passenger or freight trains on such a railroad."

These observations from Lewis on Eminent Domain are pertinent in this connection: "It would seem to follow that the operation of express cars on the street railway tracks was a legitimate use of the street. The use of street cars for the transportation of freight has but just begun. Whether the practice is likely to increase and become general remains to be seen. When we direct our attention to the moving freight car, taking the place of twenty drays, twenty pairs of horses and twenty drivers, the advantages of such a use of the streets seem obvious. It is presumably more economical. It saves wear and tear of the street, diminishes the accumulation of dirt and filth, relieves congestion, and diminishes the noise and confusion. The movement of the freight car would no more interfere with abutting property than the movement of the passenger car. To the extent that the freight car is a substitute for traffic teams on the street, it thus tends to make the street quieter, cleaner, freer and more sanitary. And since the street exists as much for the movement of freight as for the movement of persons, there seems to be no reason why the street freight car should not be put upon the same basis as the street passenger car, in so far as concerns the mere movement of the car on the tracks and in so far as it carries freight which would otherwise be carried in vehicles on the streets." Lewis on Eminent Domain (3d ed.), section 166, page 292

A recent case involving the same general question is *Turner* v. *North Carolina Public Service Co.*, 174 N. C. 522, 93 S. E. 998, 2 A. L. R. 1399. The facts appearing there were that the station of the Carolina and Yadkin Railroad Company and its freight yards are located within the city limits of High Point, and the lines of the North Carolina Pubilc Service Company (street

railway), including the one complained of, are situated exclusively within the city limits. The freight cars which were hauled along the streets were never more than two at a time, and they were carried exclusively between the freight yard and various factories within the limits of the city, the freight exclusively originating in or consigned to these factories within the city of High Point. It was contended by the plaintiff that this was an additional servitude for which she as an abutting owner was entitled to compensation. The court discusses the question in the usual way, among other things saying: "The reasons given in the *Briggs Case*, 79 Me. 363, 1 Am. St. Rep. 316, 10 Atl. 47, and the *Taylor Case*, 91 Me. 193, 64 Am. St. Rep. 216, 39 Atl. 560, why the changed methods of transportation of passengers do not result in an additional servitude, apply with equal force to changed methods in transporting property. The right of public travel includes the right to transport property in drays and wagons." (To this may be added also the right to transport it in the massive modern truck and trailer driven by gasoline engine.) "To transport it in cars is but another and more modern way of transporting it. * * * So that we think the right to haul freight in cars, if the right exists, imposes no additional servitude upon the land in a street over which the railroad runs, and affords no reason for saying that the legislative grant of the right is unconstitutional, as impinging upon the constitutional provision which forbids the taking of private property for public uses without just compensation."

In the *Turner Case* there was legislative authority for the ordinance. Incidentally, the court said: "The enterprising city of High Point has taken every step needful to establish competition and improve service

in the handling of freight originating within its limits. The Southern Railroad Company runs its double-track railway through the heart of the city, and at one time enjoyed a monopoly of all incoming and outgoing freight. The city, acting through the vote of its citizens, has made possible the use of its streets in carrying freight in cars rather than in drays, thus avoiding the expense of breaking bulk and establishing effective competition, and by using, in this way, the station of a competing railway, it has destroyed the freight monopoly heretofore existing. It has been well said: 'The law of the public streets of a city is declared to be motion. Any use of a street, though a new one, which does not materially abridge or obstruct the right of passage and repassage, on ingress and egress, and to light and air, of the abutting owner, gives no cause of action.' " It was there held that this use of the street car line was not an additional servitude for which the abutting owner was entitled to damages.

A later case is *Chicago, Lake Shore & South Bend Ry. Co.* v. *Guilfoyle* (1926), 198 Ind. 9, 152 N. E. 167, 46 A. L. R. 1465, where it is held that the mere fact that freight is being transported to and from a point on a street, and that it must in any event be carried upon or along the street, or some part of it, by some means, whether by drays, trucks, or wagons, running upon the pavement, or by cars running on rails, is hauled instead on freight cars operated with the consent of the city on the tracks of an interurban street railroad, does not of itself constitute an additional servitude.

Recognizing the difficulties and confusion, Judge Dillon (3 Dillon Mun. Corp., 5th ed., section 1258, page 2032, note) says this: "The author ventures to observe that in respect of motor power employed and especially of the character of the service rendered, many

suburban and even interurban electric railways, especially in populous localities, more resemble what are called street railways than ordinary steam railways. They facilitate traffic, communication and transportation. They do not destroy or seriously interfere with the ordinary modes of using the streets and highways, and when legislatively authorized they seem to be a proper use of the street or highway, for which the legislature may or may not provide compensation to the abutter, as it may determine, the rule of justice dictating that where the value of the abutters' property is lessened over and beyond the benefits received, the legislature ought to provide that he should be paid in money for such diminished value, For example, would an electric line of railway connecting the Oranges in New Jersey with each other and with Newark, Hoboken and Jersey City, fall within the category of an ordinary commercial steam railway rather than that of a street railway? Such a line may stand in a class by itself, and it does not seem to the author that simply because it connects different places it necessarily imposes an additional burden upon the abutter. Each case must be considered on its circumstances. Each line is *what it is*, and not something else."

The note in 2 A. L. R., page 1406, repeats this idea in this language: "The fact that this is the only method by which satisfactory results can be arrived at is emphasized by a study of the cases which have sought to adopt more direct methods. Dillon and other writers realizing the difficulties which must beset an attempt to adopt shorter and simpler processes, have asserted, and we think correctly, that, after all, each situation must be dealt with upon its merits "

Out of the discord comes this true note from that great master, Judge Cooley: "Perhaps the true dis-

tinction in these cases is not to be found in the motive power of the railway, or in the question whether the fee simple or a mere easement was taken in the original appropriation, but depends upon the question whether the railway constitutes a thoroughfare, or, on the other hand, is a mere local convenience. When land is taken or dedicated for a town street, it is unquestionably appropriated for all the ordinary purposes of a town street; not merely the purposes to which such streets were formerly applied, but those demanded by new improvements and new wants. Among these purposes is the use for carriages which run upon a grooved track; and the preparation of important streets in large cities for their use is not only a frequent necessity, which must be supposed to have been contemplated, but it is almost as much a matter of course as the grading and paving." 2 Cooley's Const. Lim. (8th ed.) page 1178.

In 4 McQuillin on Municipal Corporations (2d ed.), section 1467, page 158, Mr. McQuillin summarizes his conclusions as to private railroads and switches in streets, citing many cases, thus: "Railroad tracks in streets for private purposes are generally viewed as unlawful obstructions and unreasonable encroachments thereon. However, where such use is public, such structures are permitted under prescribed conditions, legal restrictions and police regulations. Accordingly, the prevailing rule is that a municipality, unless specially authorized, cannot grant to private individuals the right to construct a railroad track in a street to connect with a railroad or otherwise, or permit a railroad company to construct a spur for such purpose, for the reason that to do so would be granting the use of a street for a private purpose. So an individual cannot ordinarily be given a license to lay a railroad track across a street for his own private use. But some cases

hold that if the switch is to be constructed and operated by the railroad company for the benefit of adjoining property owners, the municipality may permit its construction on a street or alley and such permit is not a grant for a private use  So an exception has been recognized where the track is allowed to be used by the public at large." He then alludes to the Illinois cases in which it has been held that a municipality has the authority to grant to private individuals the right to lay switch tracks in a street to connect manufacturing plants located on private property with the main track of a railroad company, on the theory that the track thus permitted is merely an extension of the track of the railroad company itself, and is, in effect, a grant to the railroad company to lay its track in the street, through the individual presenting the application; and then to the Montana case in which it has been held that over the objection of abutting owners and without recompense, a city may grant a mining company the right to construct a railroad over certain streets entirely within the limits of the city, to carry supplies and ores which would otherwise have to be carried by teams. The tendency, against much and vigorous dissent, is to extend the right to use new and improved vehicles and means of locomotion, so that it has now become very difficult to draw the line between the public and the private right.  2 Elliott, Roads & Streets (4th ed.), section 886, page 1162.

Considering this case in the light of these views, it seems to us quite apparent that this particular tramway, operated upon this particular street, is not an additional servitude; and so if its construction had been lawfully authorized, their prayer for relief should have been denied. The brick company has the clear legal right to transport its materials through these streets

by trucks or drays, and the permission to carry them in this way, if not beneficial to the plaintiffs is no more obnoxious than if otherwise transported, and does not invade any of their legal rights as owners of the fee in the street. The public right to use the streets legitimately for transporting property is and should be as secure and inviolate as the private rights of the abutting owner.

2. This brings us to the second objection, and that is that the act referred to is class legislation, prohibited by section 63, clause 18, of the Virginia Constitution. That clause prohibits the General Assembly from granting to any private corporation, association, or individual, any special or exclusive right, privilege or immunity.

That the right to lay tracks in the public street and to operate a steam engine and cars over them is a special right or privilege accorded to the Richlands Brick Corporation is obvious. No other person has been accorded such a privilege. Only persons, firms or companies who are engaged in mining, manufacturing or merchandising could be accorded such a privilege under the act itself.

It seems hardly necessary to say that the General Assembly cannot do by indirection that which it cannot do directly The municipality cannot be vested with powers which the General Assembly itself does not possess.

In construing a similar section of the Illinois Constitution, in *Hibbard* v. *Chicago*, 173 Ill. 91, 50 N. E. 256, 40 L. R. A. 623, referring to a resolution which amounts to a mere license to a particular firm to erect a certain kind of permanent awning in the street, supported over the outer edge of the sidewalk by iron posts, contrary to the general ordinance prohibiting

such awnings, it is said that this "is a special privilege granted to one by license, which, by the general ordinance applicable to all the citizens within the corporate limits of the city of Chicago, is prohibited to others; and whatever is prohibited by the Constitution of the State from being done by the legislature cannot be done indirectly through another body; and an ordinance of a municipal corporation must be in harmony with the general laws and Constitution of the State, and whenever such ordinance comes in conflict with the Constitution it is void. A municipal corporation cannot confer power upon one person to do an act which is prohibited to another having an equal right to do the same act, and ordinances cannot favor or discriminate against any person or class of persons, but must be uniform, and of general operation within the corporate limits."

The same view is expressed in *People* v. *Clean Street Co.*, 225 Ill. 470, 80 N. E. 298, 9 L. R. A. (N. S.) 460, 116 Am. St. Rep. 161: "It is provided by section 22 of article 4, *supra*, of the Constitution, that the General Assembly shall not pass a law granting to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise whatever. Ordinances of municipal corporations must be in harmony with the Constitution, and, if in conflict therewith, they are void."

We assume that the act, which is special in its terms, was passed in accordance with the Constitution. So considered, it may be held to be in substance an amendment to the charter of the town of Richlands, and the objection to it in this respect, *i. e.*, merely because it is a special act, is not sound. *Campbell* v. *Bryant*, 104 Va. 509, 52 S. E. 638; *Miller* v. *Pulaski*, 109 Va. 138, 63 S. E. 880, 22 L. R. A. (N. S.) 552.

■ This, however, does not solve the difficulty. However advantageous it may be for the brick company, and desirable for all the property owners of the community, except the appellants, thus to transport these materials through the streets, such a question cannot be settled by merely acceding to the wishes of the overwhelming majority. Whether wisely or unwisely, the Constitution (section 63, clause 18) prohibits the granting by the General Assembly, directly or indirectly, of such a special right and privilege to any private corporation, association or individual, and the appellants, who are directly interested as owners of abutting lots, have the right to insist upon its observance.

The act being, in this respect, invalid, the franchise based thereon has no support, and so another general rule is decisive:

■ In the absence of express legislative authority, a municipality has no power to grant the use of streets for private purposes, and abutting owners who suffer special damages by reason thereof may have appropriate remedy to prevent, or recover damages therefor. 1 Lewis on Eminent Domain (3d ed.), section 127, page 199, and cases cited. *Commonwealth* v. *Morrison*, 197 Mass. 199, 83 N. E. 415, 14 L. R. A. (N. S.) 194, 125 Am. St. Rep. 345, note; 13 R. C. L., section 172, page 202.

In 2 Elliott on Roads and Streets (4th ed.), section 941, page 1236, this is stated: "A municipal corporation cannot grant a right to construct a railroad in a street for private use. We suppose it to be indispensable to the validity of a direct legislative grant that in every instance the use should be public, for highways are held in trust for the public for public purposes and no other. This rule is clearly the legiti-

mate sequence of the fundamental principles, that private property can never be seized under the power of eminent domain for merely private purposes, and that roads and streets are held for the public use and never for permanent private purposes." Citing *Macon* v. *Harris*, 75 Ga. 761; *Heath* v. *Des Moines, etc., R. Co.*, 61 Ia. 11, 15 N. W. 573; *Mikesell* v. *Durkee*, 34 Kan. 509, 9 Pac. 278; *Glaessner* v. *Anheuser-Busch, etc., Assn.*, 100 Mo. 508, 13 S. W. 707; *Gustafson* v. *Hamm*, 56 Minn. 334, 57 N. W. 1054, 22 L. R. A. 565; *Butler* v. *F. R. Penn. Tobacco Co.*, 152 N. C. 416, 68 S. E. 12, 136 Am. St. Rep. 831; *Schwede* v. *Hemrick Bros. Brew. Co.*, 29 Wash. 21, 69 Pac. 362

It seems to be generally held that the construction of a railroad upon a street without authority is a nuisance, and it seems to have been frequently held that the unlawful obstruction of a highway will generally support an action by an abutter who is specially injured, although it may not constitute a taking of his property. 2 Elliott on Roads & Streets (4th ed.), section 1046, page 1428; *Cadle* v. *Muscatine Western R. Co.*, 44 Iowa 11; *Stephens* v. *New York, etc., R. Co.*, 175 N. Y. 72, 67 N. E. 119; *Cushing-Wetmore Co.* v. *Gray*, 152 Calif. 118, 125 Am. St. Rep. 47, 92 Pac. 70.

For the reasons indicated, then, our conclusion is that the court erred in refusing to award the injunction and in dismissing the bill. This court will, therefore, enter a decree correcting those errors and awarding the injunction.

*Reversed.*